Thank you, your honor. May it please the court. Good morning. My name is Michael Burke and I represent Mr. Madrid-Becerra. I will watch the clock and attempt to reserve two minutes of my time for rebuttal. This appeal concerns the application of Section 4A 1.1d of Sentencing Guidelines to a now-repealed Arizona statute that permitted the Arizona, the director of the Arizona Department of Corrections at his or her discretion to release state prisoners to immigration for purposes of deportation after they had served one half of their sentences. Interpreting 4A 1.1d in this case, the district court concluded that Mr. Madrid-Becerra, that his 2014 release from the Arizona Department of Corrections meant that he was, quote, under a criminal justice sentence when he was found in the United States in December of 2017, and it therefore adopted the pre-sentence report's recommendation that his criminal history be increased by two points. Upon de novo review, we ask this court to reverse the district court's ruling for the following reasons. First, the Arizona's repeal of it, that statute, the early release statute in 2016, more than a year before Mr. Madrid-Becerra was discovered in the United States, deprived the Department of Corrections, we submit, of the actual authority to invoke. It didn't, I mean, that didn't somehow eliminate his sentence or the criminal judgment that produced it. It meant that it couldn't be applied before, but I really don't see how that impacts your client. Your Honor, and we are not challenging the validity of Mr. Madrid-Becerra's 2013 conviction or the sentence that was imposed. What we are saying is that the early release program that was used in this case was an administrative program. It was left entirely to the discretion to the director of the Department of Corrections. It was not affiliated with any action of the court or any probation office. It was purely administrative, and once that statute was repealed, there was no provision under Arizona law for the Department of Corrections to validly repeal his or revoke his release. We are, again, we are not challenging the validity of his underlying conviction. We are simply saying that there was no authority to revoke. Even if this court, however, were to find that that authority continued to exist, the statute as it is, would not be valid. The statute does not provide for any supervisory role or any any type of supervision. I'd like to address those both, but I'd also like the court to consider as a backdrop the probation officers' statement at sentencing in this case, at ER 20, where the probation officer noted that the probation office had buried in its application of this provision. This is from ER 20 line 9. It's saying it varies from judge to judge, and it's been ebbing and flowing throughout the years with the half-term deport. Sometimes it counts, and then there was a wave. I don't know how long and when this was, but the enhancement didn't apply for a little while, and then it's kind of been applied a few times recently. When you when you look at the plain language of 4A1.1D, I guess I don't see how it couldn't apply. I mean, it says having a custodial or supervisory component, your client was under a sentence that had a condition that if he came back into the United States illegally, he would then be, he could be put back into custody. So I guess how could that not have a custodial component to it? It looks like it clearly fits under the plain language in the statute. I just haven't, not really understanding the argument as to how this could somehow be outside of this provision. Your Honor, I agreed the custodial aspect of the provision to apply to actual incarceration of some form, as opposed to some form of release, such as parole or supervised release or unsupervised release, which would then have some supervisory component to it. Here, he was released from prison in 2014, and there was no active supervision of him at all. In fact, the rule here, the guidelines, says active supervision is not required. Yeah, how could Arizona have supervised him at all? I mean, how is that even a physical possibility? I mean, that's the whole purpose of this thing, was to place him sort of beyond their powers by sending him home. Absolutely, Your Honor, I entirely agree. And I think that that furthers our argument, because they were not supervising him. If he returned under the statute as it existed at the time, they had the right to reincarcerate him. But no one was supervising him. It was only if the Arizona Department of Corrections was informed by some other entity that he had returned to the United States illegally, that he could be reincarcerated. And I'd like to also mention that point as well. The statute provides, and even if this court still finds that that statute somehow provided the authority in 2018 or 2016, excuse me, no, 2018, to reincarcerate Mr. Madrid Becerra. It required that he be reincarcerated only if he illegally re-entered the United States. Understandably, given Mr. Madrid Becerra's situation, that would be the likely basis for his return. He was reincarcerated, he was incarcerated on a different offense in the Arizona State Department of Corrections in 2018 before it had ever been determined judicially that he had illegally re-entered the United States. That was not until 2019 when he pled guilty to illegal re-entry under 1326. So even under those situations, we would say that the provision does not apply. But again, does the Arizona statute, as you read it, depend on a United States that he has illegally re-entered? Did Arizona make its own inquiry and say, did you come through a port of entry? And if you didn't come through a port of entry, then you illegally come into the United States whether the U.S. Attorney decides to charge you or not. I would say, Your Honor, that the statute is silent on that fact. It just says return illegally. There's no dispute that he did do that, right? Not at all, Your Honor. In this case, he pled guilty to coming into the United States illegally. So, I mean, it's a pretty bright line rule. I mean, this is actually not all that difficult to determine. This, you know, whether the United States decided to prosecute somebody in Madrid's situation or not is sort of irrelevant to the question. It would be very easy for Arizona to determine whether somebody who was back in the United States after having been deported under those circumstances had returned legally, lawfully, or illegally. And as you pointed out, I think very quite honestly, under his circumstances, he wasn't likely to be able to come back to the United States. And Arizona would know that. That's absolutely true, Your Honor. Then I would argue that the record in this case does not show that that determination was ever made. It also does not show that his release was ever revoked. What we know is that he was sentenced under a separate criminal offense. And the most that we know is that the judge who sentenced him stated that his return, that his 2017 sentence would be concurrent with his 2013 sentence. But there is nothing in the record, and it's the government's burden to prove by a preponderance of the evidence that this occurred. They say his petition, his release was revoked. But there is nothing to substantiate that in the record. Why does that matter here? I mean, it doesn't seem that 4A1.1D turns on that question. It asks whether he was under any criminal justice sentence having a custodial or supervisory component. And it seems clear that he was. Well, I obviously, Your Honor, we disagree that that is clear he was. And I think that the fact that the record is devoid of any evidence that the Arizona Department of Corrections took any action to revoke his 2014 release is relevant to whether his he was under a criminal justice sentence at the time. I know your time is almost up, but we'll put a little time on the clock for rebuttal, but I just... Why do you think that the fact of the revocation is relevant under the provision? That's, I guess, the question I'm trying to get at. Why does this factual question matter? I would say that it is relevant to the question of whether the statute was still being invoked and valid. Okay. And that's our initial argument, that there's nothing in this record to show that that he was ever sent back. And if that is relevant to the question of whether he was, in fact, under a criminal justice sentence. With the court's permission, I will... Thank you, Mr. Berg. We took you a little over. And so we'll put a minute on the clock when you come back up. Thank you. Thank you. We'll now hear from the United States. Good morning. May it please the court. Seth Gertz for the United States. If defendant is correct, then not only was the remainder of his 2013 sentence effectively nullified by the repeal of the half term program, but so was the remainder of every other criminal sentence that that program cut short. We are talking about a diverse array of sentences rendered according to entirely separate criminal statutes. And if defendant is correct, the remainder of every one of those was nullified by the repeal of the half term program. Defendant has not cited a single case to support that. There is no other evidence in the record that he points to. And it's antithetical to the Arizona legislature's intent in repealing the statute, which was to ensure that non-citizens served more, not less, of their sentences. We can also look to the record in this case, which is clear proof that the repeal did not have such wide ranging effects. The state's sentencing court clearly believed it had the authority to reimpose the remainder of that sentence when it did so in 2018. And if it didn't think so, the prosecutor didn't think so, and the defense attorney didn't think so. It was never challenged. How long was this half term program in place? I believe it was in place, Your Honor, beginning in the mid 90s until 2016. But I'm not entirely sure on the beginning, but obviously it was repealed in 2016. Is there any evidence in the record or in some other public sources that how many defendants were sentenced under this and then deported? I have not been able to find any comprehensive statistics, and it's not in the record. Though, in preparing for this oral argument and conferring with colleagues in the office, it is something that continues to come up. As defense noted in his opening statements, this is an issue that continues to arise in district courts. And I know it's something that even the last several years, the state courts have been reimposing sentences that were cut short due to this program. Do any other states have this kind of program? Do you know? I don't know, Your Honor. I have a question for you, Mr. Goetz, and that is, isn't the issue of whether Arizona has the power to reimpose a sentence different than whether this falls under the guidelines under 4A1.1D? And qualifies for two criminal history points. I mean, it requires that the defendant have been under a criminal justice sentence. And the issue here, at least my understanding of a criminal justice sentence, requires some sort of supervision for a definite term by a judicial function. This was an agency imposed. We're going to release you for an indefinite term. And the only qualification is you can't disobey the law. And I think Ninth Circuit case law says that telling you you can't violate the law is not really a term of probation. So isn't that a separate issue of whether Arizona has the power to reimpose a sentence versus whether this qualifies under 4A1.1D? As you're stating it, Your Honor, there is a distinction there. In answering your question, I guess I would say that I do think under Ninth Circuit law, Franco Flores and Ramirez-Sanchez, supervision is not required, as it's stated in the guidelines. Which requires that there be some custodial elements as well to it and that there be an enforceable sentence and that there is a hook to return the defendant to custody. So, for instance, in Ramirez-Sanchez, we had a defendant who was removed from the country before he was on probation. Probation was never imposed. He came back into the United States. And that, even though probation had not been reimposed, it was found that he was under a criminal justice sentence. And I think in this case, there is a clear custodial element to it, much like the escape example that's given in the guidelines. And under an escape status, there is no agency of any sort that is responsible for monitoring the defendant. All that remains is an outstanding sentence that the state or the government has the power to reimpose and to put the defendant into custody. And on that note, the final thing I would say is that Franco Flores, there was agency supervision. But the court did also note that what made that, what in part turned the analysis, was that the court had the authority to issue an arrest warrant and put the defendant and ultimately sentence the defendant and incarcerate him. So I do think those elements are present here. There was a term. Defendant was given a clear condition. And upon violating that condition, he was returned to prison, as we know, from the state court sentencing documents in 2018. So it's your position that because that Arizona sentence had had a term and it had not been completed, he remained under that sentence? Exactly. If your honors don't have any further questions, we would ask that you affirm the district court's judgment here. You can ask Judge Cardone and Judge Bybee if they have any additional questions. I don't. Thank you. Mr. Burke, go ahead and unmute. Thank you. Very briefly, the government makes the point that if our argument is correct, it will have a profound effect on many defendants. I would point out, though, that if the government is correct, it means that any person who was released by the Department of Corrections under the half-term program remains under a criminal justice sentence for the remainder of their lifetime. That is highly unusual. Very rarely does someone be placed on probation for a lifetime. It does happen in the federal system. We know that. But it's the exception, not the rule. Here, every defendant released half-time, and it is not something they request. It is something that is done to them, remains under the government's interpretation for the remainder of their life under a criminal justice sentence. That, I think, is fair. Your Honor, I guess the question is, what relevance does that have to this particular question? And perhaps there's some other independent basis to challenge the sentence on some other ground, but why does that affect this case, the point you just made? Your Honor, I say that it affects the interpretation this Court should give to the United States Sentencing Guidelines, just to decide that in this... Because the question is a federal one. We are looking at the guidelines here, and you must look individually at various programs. And in this case, the program suggests that it is different from what is noted in the guidelines, because it is so unusual that it carries with it a lifetime of under a criminal justice system. Counsel, what do you do with our decision in Ramirez-Sanchez? How do you distinguish that one? Your Honor, I have to apologize. I don't remember the exact facts of the rumor, and it would be disingenuous for me to try to distinguish it. Thank you for your candor. Mr. Burke, we've let you go over, and I want to make sure you've said everything you want to say. So you want to go ahead and wrap up? We simply ask that this Court reverse the district court's imposition of the two-point increase in the criminal history, and send this case back for resentencing. Thank you. Thank you, Mr. Burke. We greatly appreciate your argument, and the argument of Mr. Goetz this morning, and this case is submitted.
judges: Bybee, Cardone, Bress